Mr. Justice Strong-
delivered the opinion of the court:
These were suits, under the Abandoned or captured property Act, to recover the proceeds of the sale of cotton captured at Savannah in 1864, and now in the Treasury of the United States. From the findings of fact in the Court of Claims it appears that the plaintiffs are corporations created by the legislature of G-eorgia in 1861 and 1863, while the State was in armed rebellion against the Government of the United States; and the question now presented is whether such corporations can be recognized as having a legal existence, with capacity to own cotton and to sue in the Court of Claims. It is insisted on behalf of the appellants that the courts of the United States will not recognize the competency of those bodies known as the legislatures of the insurgent States to create corporations such as insurance, banking, and trust companies; and as the plaintiffs in the court below were incorporated under acts passed after the attempted secession of Georgia from the Union, and before the close of the war, it is argued that they can have now no legal existence.
It may well be doubted whether, under the pleadings in the court below, the appellants have any right to raise such an objection here. There was no plea that traversed directly the corporate existence of the plaintiffs. A general denial of the averments of the petition was hardly sufficient. Notwithstanding the old rule that a corporation suing must prove its corporate existence, it has been many times decided that a plea of the general issue admits its capacity to sue, as does going to trial upon the merits. (Lehigh Bridge Company v. The Lehigh Coal and Navigation Company, 4 Rawle, 9; Sutton v. Cole, 3 Pick., 245; Conard v. The Atlantic Insurance Company, 1 Pet.,. 450; The Society for the Propagation of the Gospel v. The Town of Pawlet, 4 Pet., 501.) And such is the established prac *153 tice in the Court of Claims. (Hebrew Congregation v. The United States, 6 C. Cls. R., 244.)
We do not, however, rest our decision upon this ground. We prefer answering the question which the appellants attempt to raise. No doubt the legislature of Georgia, in 1861 and 1863, when the enactments were made for the incorporation of these plaintiffs, was not the legitimate legislature of the State. The State had thrown off its connection with the United States, and the members of the legislature had repudiated or had not taken the oath by which the third section of the sixth article of the Constitution required the members of the several State legislatures to be bound. But it does not follow from this that it was not a legislature the acts of which were of force when they were made, and are in force now. If not a legislature of the State de pire, it was at least a legislature de facto. It was the only law-making body which had any existence. Its members acted under color of office, by an election, though not qualified according to the requirements of the Constitution of the United States. Now, while it must be held that all their acts in hostility to that Constitution or to the Union of which the State was an inseparable member have no validity, no good reason can be assigned why all their other enactments, not forbidden by the Constitution, should not have the force which the law generally accords to the action of defacto public officers. What that is was well stated by Kent in the 2d volume of his Commentaries, page 295. “ In the case of public officers,” he says, “ who are such defacto acting under the color of office by an election or appointment not strictly legal, or without having qualified themselves by the requisite tests, or by holding over after the time prescribed for a new appointment, as in the case of sheriffs, constables, &c., their acts are held valid as it respects the right of third persons who have an interest in them, and as concerns the public, in order to prevent the failure of justice.” And thus this court has ruled, in regard to the legislatures of the insurgent States, in several cases which have come up for our decision. In Texas v. White and Chiles (7 Wall., 700) Chief-Justice Chase, in delivering the opinion of the court, (while declining to attempt any exact definition within which the acts of an insurgent State government must be treated as valid or invalid,) remarked: “It maybe said, perhaps with sufficient accuracy, that acts necessary to peace *154 and good order among citizens, such, for example, as acts sanctioning and protecting marriage and tbe domestic relations, governing tbe course of descents, regulating tbe conveyance and transfers of property, real and personal, providing remedies for injuries to person and estate, and other similar acts wbicb would be valid if emanating from a lawful government, must be regarded in general as valid when proceeding from an actual though unlawful government, and that acts in furtherance or' in support of the rebellion against the United States, or intended to defeat the just rights of citizens, and other acts of like nature, must in general be regarded as invalid and void.” This language was intended only as an outline, but it sufficiently indicates where is the line .between valid and invalid acts of the legislatures of the insurgent States. Similar opinions were expressed in Sprott v. The United States, a case decided at this term, (ante, p. 1.) There, when speaking of the powers of the insurgent States, our language was: “ It is only when, in the use of these, powers, substantial aid and comfort was given or intended to be given to the rebellion, when the functions necessarily reposed in' the State for the maintenance of civil society were perverted to the manifest and intentional aid of treason against the Government of the Union, that their acts are void.” And with equal distinctness was it said in Horn v. Lockhart, (17 Wall., 580 :) “ We admit that the acts of the several States” (in insurrection) “in their individual capacities, and of their different departments of government, executive, judicial, and legislative, during the war, so far as they did not impair or tend „to impair the supremacy of the national authority or the just rights of citizens under the Constitution, are in general to be treated as valid and binding. The existence of a state of insurrection and war did not loosen the bonds of society or do away with civil government or the regular administration of the laws. * * * Ho one that we are aware of seriously questions the validity of judicial or legislative acts in the insurrectionary States touching these and kindred subjects, when they were not hostile in their purpose or mode of enforcement to the authority of the National Government, and did not impair the rights of citizens under the Constitution.” After these emphatic utterances controversy upon this subject should cease.. All the enactments of the de facto legislatures in the insurrectionary States during *155 the war, which were not hostile to the Union or to the authority of the General Government, and which were not in conflict with' the Constitution of the United States or of the States, have the same validity as if they had been enactments of legitimate legislatures. Any other doctrine than this would work great and unnecessary hardship upon the people of those States, without any corresponding benefit to the citizens of other States, and without any advantage to the National Government.
Tried by the rule thus stated, the enactments by which the plaintiffs in these cases were incorporated must be treated as valid. They had no relation to anything else than the domestic concerns of the State. Neither in their apparent purpose nor in their operation were they hostile to the Union or in conflict with the Constitution. They were mere ordinary legislation, such as might have been had there been no war or no attempted secession; • such as is of yearly occurrence in all the States of the Union. We hold, therefore, that the Court of Claims correctly decided that the plaintiffs were lawfully incorporated, and that they had a legal capacity to sue in that court.
It remains only to notice one other position taken by’the appellants during the argument. It is that even if the plaintiffs below are corporations which this court can recognize as such, they cannot sue in the Court of Claims for the proceeds of the sale of captured, and abandoned property, because, as it is argued, the Abandoned or captured property Act provides only for suits by persons who could have given aid and comfort to the rebellion. It is said corporations were incapable of giving such aid, and that they cannot make proof that they have never given it. Nothing in the assignments of error justifies the presentation of such an argument. But were it otherwise, the argument would be plainly unsound. The act of Congress confers the right to sue upon any person claiming to have been the owner of the captured or abandoned property. It makes no distinction between natural and artificial persons, and it has not been doubted that corporations created before the war commenced might sue. Many such actions have been sustained. It is no objection to them that plaintiffs in all suits are required to make proof that they have never given aid and comfort to the rebellion. Such proof may be made as well by *156 artificial as natural persons. Corporations may have rendered very substantial aid to the armed resistance to the laws of the United States. They may have made loans or contributions to the confederate government. They may even have fitted out companies or regiments of soldiers. If they have rendered no aid, the fact is quite capable of proof.
The judgment of the Court of Claims in each case is affirmed.